1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7    AUSTIN KOEPKE,                           Case No.  18-cv-00407-DMR
            Plaintiff,
8
9       v.                                    **ORDER ON CROSS-MOTIONS FOR
                                              SUMMARY JUDGMENT**
10   NANCY BERRYHILL,
                                              Re: Dkt. No. 15, 21
            Defendant.
11

12          Plaintiff Austin Koepke moves for summary judgment to reverse the Commissioner of the

13   Social Security Administration's (the "Commissioner's") final administrative decision, which found

14   Plaintiff not disabled and therefore denied his application for benefits under Title XVI of the Social

15   Security Act, 42 U.S.C. § 1381 *et seq.*  [Docket No. 15 (Pltf. Mot.).]  The Commissioner cross-

16   moves to affirm.  [Docket No. 21 (Def. Mot.).]  For the reasons stated below, the court grants in part

17   Koepke's motion, denies the Commissioner's cross-motion, and remands this case for further

18   proceedings.

19   I.     **PROCEDURAL HISTORY**

20          Koepke filed an application for Supplemental Security Income (SSI) on August 28, 2014,

21   which was initially denied on February 10, 2015 and again on reconsideration on June 2, 2015.

22   Administrative Record (A.R.) 81-86, 93-98.  On July 14, 2015, Koepke filed a request for a hearing

23   before an Administrative Law Judge (ALJ).  A.R. 100-02.  Koepke appeared at the January 27, 2017

24   hearing with an attorney representative and testified under oath.  A.R. 30-54.

25          After the hearing, ALJ Kevin Gill issued a decision finding Koepke not disabled.  A.R. 12-

26   25.  The ALJ determined that Koepke has the following severe impairments: anxiety disorder,

27   affective disorder, and schizoaffective disorder.  A.R. 17.  The ALJ found that Koepke retains the

28   following residual functional capacity (RFC):

> to perform a full range of work at all exertional levels but with the following non-exertional limitations: he is limited to perform simple, routine, and repetitive tasks, but not at a production rate pace (e.g. assembly line work); he can respond appropriately to coworkers occasionally; he can respond appropriately to the public only on a brief, casual basis and no more than 10% of the day; and he can deal with changes in the work setting when limited to simple work-related decisions.

A.R. 19. Relying on the opinion of a vocational expert (VE) who testified that an individual with such an RFC could perform other jobs existing in the economy, including hand packager, marker, and cleaner/housekeeper, the ALJ concluded that Plaintiff is not disabled.

The Appeals Council denied Koepke's request for review on November 22, 2017. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Koepke then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.     THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.     At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.     At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

2

impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.    At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.    At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his past relevant work, the ALJ will find that the claimant is not disabled.

5.    At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Testimony

At the hearing on January 27, 2017, Koepke testified that he is a single man who lives with his parents.  A.R. 35.  He does not have a driver's license and generally gets around by walking.  A.R. 35.  He was enrolled in special education classes throughout school and graduated from high school.  A.R. 35-36.  Koepke enrolled in one class in Alameda Community College but dropped out because "[t]he work was too difficult for me to understand."  A.R. 37.  He has no vocational training, certifications, or licenses for any type of work.  A.R. 36.  He has no work history and has not applied for any jobs in the last couple of years.  A.R. 36.

Koepke testified that his conditions prevent him from working.  A.R. 36.  With respect to his physical symptoms, he stated, "I feel a lot of pain throughout my body when I feel anxious, it's hot or it's just uncomfortable."  A.R. 37.  Regarding his mental impairments, Koepke reported that he has chronic depression and anxiety.  A.R. 37.  He first felt depressed around the fifth grade.  A.R.

3

39.  His depression symptoms include "[s]luggishness, irritability, intense sadness, the feeling of hopelessness."  A.R. 40.  He stated that he has difficulty concentrating but does not have any problems with memory.  A.R. 40.  Koepke reported that he "always" feels anxious, and his anxiety is particularly triggered when he is "in places with a lot of people [or] in small places."  A.R. 41-42.  He also feels anxious "[i]f it's very hot, new things, lots of noises, places that I'm unfamiliar with."  A.R. 42.

Koepke testified that he avoids leaving his house because of his anxiety.  A.R. 42.  On a typical day, he does chores around the house, such as cooking, washing dishes, vacuuming, sweeping, and cleaning the toilets.  A.R. 42-43.  He stated that he needs reminders to complete his chores and usually gets distracted while doing them.  A.R. 43-44.  In his free time, he likes to draw, paint, read, watch TV, play video games, and go for walks at night.  A.R. 44.  He does not play video games that require him to interact with other people online.  A.R. 48.  He can usually read a book for about 10 minutes before taking a break or getting distracted.  A.R. 46.  Sometimes Koepke takes his six-year old sister to school, picks her up, makes food for both of them, and helps her with her homework.  A.R. 42.  He usually only leaves the house to pick up or drop off his sister from school.  A.R. 43.  He does not drive, and he does not take public transportation because it causes him too much anxiety.  A.R. 43.

With respect to his depression symptoms, Koepke testified that he sleeps during the day and has lost interest in activities that he used to enjoy, such as reading, going out for walks, and drawing.  A.R. 40.  He reported that he previously has had thoughts about killing himself, and that he attempted suicide on two prior occasions.  A.R. 41.  Koepke reported that he sometimes feels paranoid, feeling that "[c]ertain people are watching me, or maybe that there's a camera around or something."  A.R. 41.  He testified that he does not frequently cancel appointments, but he may miss appointments "[i]f something comes up, or I need to take care of my sister, or I just don't feel good that day."  A.R. 41.  Koepke stated that his medication helps, but he still experiences symptoms.  A.R. 40.

Koepke reported that he isolates himself from everyone and has difficulty being around strangers.  A.R. 43.  When asked whether he could do simple tasks in a room alone, he stated that it

4

"would be pretty easy." A.R. 47. He later qualified the statement to say that it would be more difficult if he had to go out to do that job somewhere else: "It would be anxious but it would gradually get easier." A.R. 48.

Koepke stated that he was currently seeing a psychiatrist at Pathways to Wellness, and had had one visit at the time of the hearing. A.R. 38. He takes Duloxetine for his depression, and does not experience side effects from this medication. A.R. 38. Prior to his treatment at Pathways to Wellness, Koepke received mental health care at Berkeley Mental Health. A.R. 38. He saw therapist Kathleen Leslie, as well as psychiatrist Gordon Juan. A.R. 39. He testified that he went to therapy appointments with Leslie "[a]t least every couple of weeks." A.R. 39.

**B.      Relevant Medical Evidence**

**1.      School Records**

The record includes some of Koepke's school records, which show that Koepke received special education services from third grade until he graduated high school in June 2014. A.R. 193-250. Koepke underwent a number of psychological assessments throughout school, which are summarized in a psycho-educational evaluation completed in February 2014 by Liam Early, a school psychologist intern, and supervising psychologist Rebecca Shoshanna. A.R. 225-26.

An evaluation report from second grade indicated concerns for "inattentiveness and anger management." A.R. 223. Koepke qualified for special education services in the third grade. A.R. 223. His third-grade evaluation indicated "processing weaknesses in the areas of visual-motor integration, attention, and auditory processing," resulting in eligibility for special education under the "specific learning disability" category. A.R. 225. His evaluation results in sixth grade showed "clinically significant scores for attention, aggression, and depression," and interviews with his parents and teachers indicated concerns for "withdrawal, somatization, adaptability, organization, interpersonal relationship difficulties, and anhedonia." A.R. 225. He continued to qualify for special education services as a student with a learning disability. A.R. 225. In eighth grade, Koepke told the school psychologist that he had thoughts of killing people, which led to a visit from the police. A.R. 224. He was not deemed a danger to himself or others; however, he was referred for a behavioral-emotional evaluation based on his "dark and foreboding" writings. A.R. 224. Results

from that assessment indicated "characteristics of a mood disorder, as well as difficulties with study and social skills." A.R. 224. He was diagnosed with pediatric bipolar disorder by a psychiatrist at Kaiser Permanente Child-Adolescent Clinic and was prescribed Risperidone. A.R. 224. Following that assessment, Koepke's disability was reclassified under the "emotional disturbance" category. A.R. 225. Behavior assessments indicated "significant concerns for anxiety, depression, atypicality, withdrawal, study skills, social skills, leadership issues, and attention problems." A.R. 225.

When Koepke started high school in 2010, staff reported that he seemed "lost in his thoughts and inattentive to classroom tasks." A.R. 224, 245. In interviews with the school psychologist, Koepke reported that he became distracted in class by his disorganized thought processes which included "unexplainable, random images." A.R. 224. His assessment that year indicated continuing significant concerns for "depression, anxiety, attention problems, and atypicality" as well as at-risk concerns for "withdrawal and adaptive skills." A.R. 225. He continued to qualify for special education services under the "emotional disturbance" category. A.R. 225. During his sophomore year, Koepke saw a therapist through Kaiser for seven months. A.R. 224. Koepke reported that he felt depressed most days and experienced panic attacks every day. A.R. 224. Koepke's high school psychologist diagnosed him with Schizoaffective Disorder and Anxiety Disorder. A.R. 226.

In his junior year, Koepke was referred for an Educationally Related Mental Health Services assessment ("ERMHS") due to his inability to focus and interact appropriately, his reports that he needed to contain aggressive urges due to his frustration, and his suicidal ideations. A.R. 226, 245-50. Results from the assessment suggested that he had "severe depressive, anxiety, and social problems, as well as severe obsessive-compulsive and post-traumatic stress symptoms." A.R. 226. The examiner indicated diagnoses of Dysthymic Disorder and Panic Disorder with Agoraphobia. A.R. 226.

The February 2014 psycho-educational evaluation concluded that Koepke continued to meet eligibility criteria for special education under the "emotional disturbance" classification based on his inability to maintain satisfactory interpersonal relationships; his inappropriate behavior or feelings under normal circumstances; his pervasive depressive mood; and his physical symptoms and fears associated with personal problems. A.R. 231. The examiners noted that "[t]hese

characteristics have been consistently present since 2009 to a marked degree, and they adversely affect [Koepke's] educational performance by limiting his ability to concentrate and complete his academic work." A.R. 231.

### 2. Treatment Records

Koepke was a patient at Berkeley Mental Health from May 2014 to November 2016, where he received psychiatric care and medication management from Gordon Juan, M.D., and therapy and case management services from Kathleen Leslie, LCSW. A.R. 314-80, 384-505, 524-57. From September 2016 through November 2016, Leslie's care of Koepke was supervised by psychiatrist Jeffrey Johns, M.D. A.R. 524-28. After November 2016, Koepke transitioned his care to another outpatient clinic, Pathways to Wellness. A.R. 558-65.

### a. Therapy Notes

During an intake meeting for Berkeley Mental Health on May 12, 2014, Koepke presented with very poor eye contact and slow speech, he was somewhat irritable and ambivalent, and he required constant redirection and encouragement to engage in conversation. A.R. 353. He "balked at participation" and reported that he has had "bad experience" with therapy and does not like it. A.R. 351. However, he seemed responsive to receiving services if the services could help him stay out of the hospital and transition to independence. A.R. 351.

On May 28, 2014, Leslie completed an initial psychiatric diagnostic evaluation. A.R. 314-19. She indicated that Koepke has symptoms of psychosis, depression, and anxiety. A.R. 314. The assessment revealed both recent and past suicidal ideation. A.R. 315. Leslie noted that Koepke's attitude was withdrawn and suspicious, he had a "flattened" mood and affected, and he was undertalkative. A.R. 317-18. He was oriented to time and place, his concentration was normal, and although his memory sometimes needed prompting, Leslie noted that it may have been due to anxiety or unwillingness to talk rather than memory difficulty. A.R. 318. Leslie recommended psychiatric and medication support as well as therapy. A.R. 232.

In an initial meeting with his treatment team in June 2014, Koepke appeared "a little overwhelmed, and very guarded." A.R. 348. He refused to make direct eye contact with the treatment providers. A.R. 348. Koepke reported that his main goal was to go to college and he

7

wanted help accomplishing that goal. A.R. 330. Koepke's individual therapy sessions mainly took place in his home. Session topics included possible work options, school enrollment, and ways Koepke could decrease his anxiety about school and taking public transportation. A.R. 334-39, 374-75, 377-79. In September 2014, Community Health Worker Rosemary Fonseca helped Koepke enroll in Alameda College. A.R. 334. Koepke reported he was eager to try a college course, and was upset when a counselor at Alameda College suggested he was not ready to attend college because he is so anxious. A.R. 335, 339. Treatment notes indicate that Koepke continued to report anxiety about leaving his house. A.R. 342. In November 2014, Leslie assisted Koepke in meeting with a college counselor to take an assessment test, about which Koepke reported feeling "nervous but also excited." A.R. 374. After taking the assessment test, Koepke said he felt good about it and it was not as complicated as he thought it would be. A.R. 374.

In early 2015, Koepke started a college course. A.R. 405, 408. He told Leslie that he was excited about school, but the first week of school was "terrifying." A.R. 405, 406. He stated he did not really understand what was going on sometimes and that he felt anxious about it. A.R. 405. On March 25, 2015, Koepke reported to his treatment team that he had not been going out hardly at all. A.R. 401. He stated that the biology class he was taking was hard and that he might try an easier class the next semester. A.R. 401. On March 30, 2015, Koepke met with Leslie and reported that he was having difficulties with his college class and accepted that he would fail the class. A.R. 402. He stated that he was bored at home but too anxious to go out, although could not specifically describe anything more about his anxiety. A.R. 402.

Therapy notes from April 9, 2015 record that Koepke continued to have high anxiety and isolate himself in his home. A.R. 389. He did not feel he would be successful in passing his college class. A.R. 389. Except for that one course, Koepke spent most of his time at home and reported feeling too anxious to go into stores or be around people other than his family. A.R. 389. Koepke had "no social life" other than one or two online friends, experienced high anxiety, had difficulty sleeping, and trouble concentrating. A.R. 389. His attitude appeared apathetic, with an anxious mood and affect. A.R. 390-91. Treatment notes from April 14, 2015 record that Koepke "significantly curtailed daily activities due to anxiety" and his symptoms of major anxiety persist

even with medication. A.R. 439, 44. In May 2015, Koepke told Dr. Juan that he quit his college class because it was too hard, but said that it was not because he had difficulty concentrating. A.R. 431.

Therapy notes from May through December 2015 show that Koepke continued to be reclusive and express anxiety about leaving his home. A.R. 479-505. In May 2015, he reported that he hardly left his house and continued to take care of his sister at home. A.R. 505. Between June and August 2015, treatment providers noted that he was "difficult to connect with" and did not respond to outreach calls. A.R. 496-504. On one occasion, he was scheduled to go on an outing with a member of his treatment team, but did not come out of his house or answer the phone when she arrived. A.R. 504. In August 2015, Koepke reported feeling stress from his parents about getting a job. A.R. 495. In September 2015, he visited a youth artwork center with Leslie to try to get involved in an activity outside of his home. A.R. 493. He stated that he liked the artwork but the center was noisy and he did not know if he could handle being there. A.R. 493. He said he was open to joining some kind of program but he hoped it would be with just a few people and more quiet. A.R. 491. In October 2015, Koepke discussed employment goals and skills in therapy and agreed to see if there were any clubs at the college that might interest him because he had not made friends so far. A.R. 489. The next week, Koepke reported that he would like to get a job but he could not figure out how to do it because he feels too anxious when he is around people, especially when there is a lot of noise. A.R. 487. In December 2015, Koepke stated that he still feels very anxious when he goes out but that his parents were pressuring him to get a job. A.R. 481. He said he would try to apply for a job at Walgreens but does not know how to get a job or if he could manage a job that involves being around a lot of people. A.R. 481. Later that month, Koepke said that he was not applying for a job because he was worried that his physical anxiety symptoms, such as becoming itchy or uncomfortable, would get him fired. A.R. 479. He expressed interest in traveling but said he did not know how anyone does things like that. A.R. 479.

Therapy notes from January to June 2016 show that Koepke continued to report symptoms of anxiety and aversion to people and public spaces. A.R. 445-77. In February 2016, Koepke reported that he felt really anxious and "nothing really helps." A.R. 470. Therapy notes from April

9

2016 describe Koepke as "almost housebound." A.R. 456. In June 2016, he reported that he just stays home and cleans up around the house, but expressed an interest in trying to return to school. A.R. 448, 450, 453. He continued to need assistance to complete tasks that would take him into public spaces, such as picking up his medication from the pharmacy or going to clinical visits with Dr. Juan. A.R. 453, 456, 465-66. His therapy sessions sometimes involved visiting community locations and managing his anxiety with the support of another person. A.R. 458-59. During this time period, Koepke also talked about his family, reporting that they "get annoyed with him," they "complain[] if he doesn't clean up," and that his stepfather is aggressive and demanding. A.R. 459, 465, 466.

### b. Psychiatry Notes

On May 15, 2014, Koepke started psychiatric services with Dr. Juan. A.R. 362. He reported chronic anxiety associated with large crowds, large classrooms, and social situations. A.R. 362. Dr. Juan noted that Koepke's behavior was irritable, hostile, and evasive, and that he had significant psychomotor retardation. A.R. 363. His speech was slow and hesitant, and he communicated in "monosyllabic responses or not at all." A.R. 363. His mood was dysphoric, irritable, anxious, and angry, and his affect was constricted and sad. A.R. 363-64. Dr. Juan prescribed Citalopram. A.R. 365. On July 10, 2014, Koepke reported that he felt less depressed but his anxiety was still present, and he had stomach aches and drowsiness after taking medication. A.R. 359. Dr. Juan switched his medication to Fluoxetine. A.R. 359. On September 11, 2014, Koepke reported "feeling better but not 100%." A.R. 357. He wanted to stay on Fluoxetine but with a higher dose. A.R. 357. He had increased energy, better motivation, and felt less depressed. A.R. 357. However, he still reported trouble with forgetfulness and a short attention span. A.R. 357. Dr. Juan adjusted Koepke's medication again in November 2014 due to side effects. A.R. 369. On December 18, 2014, Koepke reported feeling "pretty good," stating that he had more energy and was planning to attend community college in January 2015. A.R. 368. Dr. Juan noted that Koepke was "relatively euthymic" on his current medication and appeared to have reached remission. A.R. 368. In February 2015, Koepke told Dr. Juan that he was "doing alright" and he was not as depressed, although the anxiety still bothered him. A.R. 397. Dr. Juan noted that Koepke presented with

10

"significant residual anxiety" and adjusted his medication again. A.R. 397.

Koepke continued to meet with Dr. Juan, who adjusted his medication repeatedly. A.R. 421-32. Koepke stopped medication intervention for approximately five months in mid-2015 but resumed in September 2015. A.R. 427-30, 491. Dr. Juan's treatment notes from July 2015 record that Koepke presented as "sleepy and amotivational," and he diagnosed Koepke with passive dependent personality disorder. A.R. 429-30. In October 2015, Dr. Juan recorded that Koepke was "slowly degrading into an agoraphobic life style." A.R. 426. In December 2015, Dr. Juan noted that Koepke was "relatively reclusive and does not seem to have social drive to form age-appropriate bonds," and that his eye contact was poor. A.R. 423. In February 2016, Dr. Juan recorded that Koepke's symptoms had not responded to a series of SSRIs and Buspar. A.R. 421. Koepke reported modest improvement in his depression symptoms with medication, but his anxiety symptoms persisted. A.R. 421. In June 2016, Koepke told Leslie that he did not think his medications help much with his anxiety although they had helped a lot with his depression. A.R. 446, 448.

Around mid-2016, Koepke's treatment teams started transitioning his healthcare to an outpatient clinic at Pathways to Wellness. A.R. 531. Therapy notes from mid-2016 to November 2016 indicate that his sessions focused on the transition process and completing the necessary paperwork for that as well as for Medi-Cal insurance. A.R. 541-557. In his final meeting with Dr. Juan on September 20, 2016, Koepke presented with his "usual flat affect" and reported compliance with his medication. A.R. 531. Dr. Juan noted that the Duloxetine Koepke was taking seems to have reduced his anxiety, but that Koepke continued to suffer from what appeared to be autistic spectrum disorder. A.R. 532. Koepke's care was transitioned to Pathways to Wellness around November 2016. A.R. 537-39.

### 3.   Sokley Khoi, Ph.D.

On January 5, 2015, Sokley Khoi, Ph.D., completed a consultative psychological examination. A.R. 381-83. Dr. Khoi obtained information from Koepke and Leslie, as well as from "available accompanying documents." A.R. 381. Dr. Khoi noted that Koepke was a "fair historian." A.R. 381.

Koepke reported to Dr. Khoi that he had a history of hallucinations and sees "things moving"

11

but had difficulty explaining the issue further. A.R. 381. He denied a history of auditory hallucinations. A.R. 381. He reported that he has severe anxiety, excessive worrying, and insomnia. A.R. 381. He also stated that he has a history of depression but that it was well controlled by Prozac. A.R. 381. Koepke noted that he has learning difficulties and attended special education classes. A.R. 381. Koepke told Dr. Khoi that he is able to perform all activities of daily living. A.R. 382. He stated he had difficulty taking public transportation because of his anxiety and that his parents manage his finances. A.R. 382. He reported that his usual activities include watching TV, reading, and taking walks. A.R. 382.

Dr. Khoi noted that Koepke was appropriately dressed and groomed, had good eye contact and a cooperative attitude, was alert and oriented, demonstrated adequate attention and concentration, and had clear and coherent speech. A.R. 382. His receptive language skills, reading and writing abilities, fund of knowledge, abstract reasoning skills, pace, persistence, thought process and content, insight, and judgment appeared to be adequate, although his mood and affect were "slightly anxious." A.R. 382.

Dr. Khoi administered the Folstein Mini Mental State Exam, and Koepke's results were within normal range. A.R. 382. Dr. Khoi noted Koepke's history of learning problems and stated that he would "likely benefit from comprehensive psychological evaluation." A.R. 382.

Dr. Khoi provided a medical source statement regarding Koepke's work-related abilities. A.R. 382. Dr. Khoi opined that Koepke had no impairments in his ability to follow/remember simple instructions, maintain adequate pace or persistence to perform simple repetitive tasks, and adapt to changes in a work routine; mild impairments in his ability to follow/remember complex/detailed instructions and maintain adequate pace or persistence to perform complex tasks; and mild to moderate impairments in his ability to withstand the stress of a routine work day and interact appropriately with coworkers, supervisors, and the public on a regular basis. A.R. 383. Dr. Khoi opined that he appeared able to manage his own funds. A.R. 382.

### 4. Kathleen Leslie, LCSW/Gordan Juan, M.D.

On May 20, 2015, Leslie, supervised by Dr. Juan, completed a mental impairment questionnaire. A.R. 411-15. They noted a diagnosis of Major Depressive Disorder. A.R. 411. They

opined that Koepke has a lot of difficulty concentrating, rarely leaves his home, and has significant anxiety that keeps him from going out. A.R. 411. They stated that his condition was expected to last at least twelve months and that Koepke is not a malingerer. A.R. 411. They identified numerous symptoms, including anhedonia, decreased energy, blunt or flat effect, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, pathological dependence, persistent disturbances of mood or affect, apprehensive expectation, emotional withdrawal or isolation, easy distractibility, and sleep disturbance. A.R. 412.

Leslie and Dr. Juan opined that Koepke has mild impairment in his ability to be aware of normal hazards and take appropriate precautions. A.R. 413. They identified moderate impairment in his ability to understand, remember, and carry out very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. A.R. 413. Leslie and Dr. Juan opined that Koepke has marked impairment in his ability to remember work-like procedures; maintain attention for two hours; sustain an ordinary routine; work near others without being unduly distracted; perform at a consistent pace without an unreasonable number and length of rest periods; set realistic goals or make plans independently of others; and use public transportation. A.R. 413-14. They also found extreme impairment in his ability to maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in routine work setting; deal with normal work stress; understand, remember, and carry out detailed instructions; deal with stress of semiskilled and skilled work; and travel in unfamiliar places. A.R. 413.

They concluded that Koepke had marked impairment in activities of daily living and maintaining social functioning, extreme impairment in concentration, persistence, or pace, and one or two episodes of decompensation within a twelve-month period. A.R. 414. Leslie and Dr. Juan opined that Koepke's impairments would likely cause him to be absent from work more than four days per month. A.R. 411.

### 5. Kathleen Leslie, LCSW/Jeffrey Johns, M.D.

On November 17, 2016, Leslie, supervised by Dr. Johns, completed another mental impairment questionnaire. A.R. 524-28. Dr. Johns noted that Koepke had been seen by a colleague (Dr. Juan), who was no longer available, due to retirement. A.R. 528. However, Dr. Johns wrote that he "reviewed this form and agree[d] with it." A.R. 528. The mental impairment questionnaire is similar in content to the one completed by Leslie and Dr. Juan the previous year, listing the same diagnosis of Major Depressive Disorder, recurrent, and the same signs and symptoms. A.R. 524-25. There are differences noted in the severity of Koepke's mental impairments, and several impairments are recorded as more severe than in the previous year's assessment.

Leslie and Dr. Johns noted moderate impairments for Koepke in his ability to carry out very short and simple instructions; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. A.R. 526-27. They identified marked impairment in his ability to understand and remember very short and simple instructions; maintain attention for two hours; sustain an ordinary routine; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; set realistic goals or make plans independently of others; and interact appropriately with the general public. A.R. 526-27. Leslie and Dr. Johns opined that Koepke has extreme impairment in his ability to remember work-like procedures; maintain regular attendance and be punctual; work near others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in routine work setting; deal with normal work stress; understand, remember, and carry out detailed instructions; deal with stress of semiskilled and skilled work; travel in unfamiliar places; and use public transportation. A.R. 526-27.

They concluded that Koepke had marked impairment in activities of daily living, extreme impairment in maintaining social functioning and sustaining concentration, persistence, or pace, and one or two episodes of decompensation within a twelve-month period. A.R. 527. Leslie and Dr.

Johns opined that Koepke's impairments would likely cause him to be absent from work more than four days per month. A.R. 524.

### 6. Katherine Wiebe, Ph.D.

On July 1, 2016, Katherine Wiebe, Ph.D., completed a consultative psychological evaluation. A.R. 506-23. Dr. Wiebe reviewed Koepke's medical records from Alameda County Behavioral Healthcare Services. A.R. 507. She noted that Koepke was a poor historian due to his psychiatric symptoms and problems with forgetfulness and inattention. A.R. 507. She considered background information to be limited as it was provided by Koepke and limited records. A.R. 507.

A review of Koepke's family and social history revealed that he was raised by his mother, and his father was inconsistently present. A.R. 507. His father argued a lot with his mother and left the family when Koepke was four years old. A.R. 507. Koepke reported that he never knew his father and denied physical or emotional abuse. A.R. 507. Records indicated that Koepke was traumatized by being bullied in school. A.R. 507. He told Dr. Wiebe that he never had any friends. A.R. 507. His stepfather has been around since Koepke was eight years old and he has a five-year-old stepsister. A.R. 507.

Dr. Wiebe provided a comprehensive review of Koepke's academic, employment, legal, and psychiatric history. A.R. 507-10. During her functional exam, Dr. Wiebe noted that Koepke has problems with attention, memory, anxiety, and somatic symptoms that affect his ability to manage activities of daily living. A.R. 510. She wrote that he has problems with insight, reasoning, and judgment that affect his ability to make sound decisions and manage his daily affairs. A.R. 510. She noted that he is unable to take public transportation due to anxiety and he would likely require assistance to be able to manage his own funds. A.R. 510.

Dr. Wiebe observed that Koepke's grooming was good, and that he walked and moved somewhat slowly. A.R. 510. He was cooperative and responsive in his attitude toward the assessment. A.R. 510-11. He seemed guarded, and his mood was depressed with underlying dysphoria and anhedonia. A.R. 511. He exhibited intermittent eye contact and had a restricted affect. A.R. 511. His speech was somewhat hesitant, taciturn, and convoluted at times. A.R. 511. He evinced some dissociation and difficulty recalling his personal history, as well as problems with

memory and attention. A.R. 511. His effort on testing was adequate. A.R. 511.

Koepke was oriented to person, place, and time. A.R. 511. He reported passive suicidality, feelings of guilt and worthlessness, and hopelessness. A.R. 511. He told Dr. Wiebe that he tried to kill himself when he was 15 years old. A.R. 511. Dr. Wiebe noted that Koepke appeared somewhat internally preoccupied but did not appear to be responding to internal stimuli during the assessment. A.R. 511. He evinced impaired insight, judgment, and reasoning. A.R. 511.

Dr. Wiebe administered a battery of tests. A.R. 511. Koepke's overall intellectual functioning was estimated to be in the average to low average range. A.R. 511. With respect to attention and concentration, Dr. Wiebe reported that Koepke evinced "erratic, overall severe impairment in functioning." A.R. 511. Koepke exhibited mild impairment in executive functioning and language, and severe impairment in memory. A.R. 512. His visual and spatial abilities were moderately impaired. A.R. 513. With respect to sensory and motor abilities, Koepke exhibited some psychomotor slowness and was easily fatigued, with overall mild impairment in that domain. A.R. 513.

Koepke's emotional functioning assessments indicated that he has severe depression. A.R. 513. His responses showed that he is unhappy and discouraged, has feelings of guilt and failure, dislikes and is critical of himself, gets very little pleasure from things he used to enjoy, and has thoughts of killing himself that he would not carry out. A.R. 513. He feels restless and less interested in other people or things than he used to be, finds it more difficult to make decisions than usual, and does not consider himself as worthwhile and useful as he used to. A.R. 513. He has less energy, sleeps more, and finds it hard to keep his mind on anything for very long. A.R. 513. He is also more irritable than usual and is too tired or fatigued to do most of the things he used to do. A.R. 513.

The assessments also revealed that Koepke experiences moderate anxiety. A.R. 513. His responses indicate that he experiences moderate to severe anxiety symptoms such as feeling hot, unable to relax, unsteady, terrified, nervous, and scared. A.R. 513. He is unable to relax, fears the worst happening, and experiences his heart pounding or racing. A.R. 513. He also reported mild problems with trembling hands, shakiness, and cold sweats. A.R. 513.

Dr. Wiebe administered the MCMI-IV, an objective test of psychiatric functioning. A.R. 513. Koepke reported problems involving low self-confidence and antisocial behavior. A.R. 513. His response style suggested "feelings of extreme vulnerability associated with a current episode of acute turmoil." A.R. 513. Dr. Wiebe wrote that the results obtained from Koepke were valid and indicate that he is not malingering. A.R. 513-14. The test data allows the assumption that he is experiencing a severe mental disorder. A.R. 514. Dr. Wiebe laid out the MCMI-IV profile obtained from Koepke in depth. A.R. 515-17. Her diagnostic impression lists Major Depressive Disorder (recurrent episode, severe); Generalized Anxiety Disorder; and Avoidant Personality Disorder, with Unspecified Personality Disorder (Melancholic) Traits, Dependent Personality Traits, and Unspecified Personality Disorder (Negativistic) Features. A.R. 518.

Dr. Wiebe opined that Koepke has moderate impairments in his ability to get along with and work with others, as well as his ability to interact appropriately with the general public. A.R. 522. She wrote that he has marked impairments in his ability to understand, remember, and carry out very short and simple instructions; understand, remember, and carry out detailed instructions; maintain attention and concentration for two hour segments; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and maintain regular attendance and be punctual within customary tolerances. A.R. 522-23. Dr. Wiebe also opined that Koepke has extreme limitations in his ability to respond appropriately to changes in a routine work setting and deal with normal work stressors, as well as his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. A.R. 522.

Dr. Wiebe concluded that it is likely Koepke would be unable to maintain a regular job for the next two years and that he requires psychological treatment. A.R. 518.

### 7. Tiffani Ordonez, N.P.

On December 14, 2016, Tiffani Ordonez, NP, completed an initial assessment for the Pathways to Wellness outpatient clinic. A.R. 558-65.

Koepke reported to Ordonez that his depression and anxiety had flared up a year prior, without a triggering event, and that his depression significantly decreased after starting Duloxetine

the previous year. A.R. 560. However, he stated that even with medication, he continued to experience anxiety when he was outside of his home, trying anything new, or outside his comfort zone. A.R. 560. He also reported that he feels intense pain and itchiness all over his body when he feels anxious. A.R. 560. He told Ordonez that he attempted to kill himself in October 2015 by choking himself. A.R. 561.

Ordonez observed that Koepke appeared adequately groomed and was cooperative; that his mood was "okay"; and that he had a constricted and apathetic affect. A.R. 562. His thought process was linear and his abstract reasoning and fund of knowledge were fair. A.R. 562-63. She noted diagnoses of Major Depressive Disorder and Unspecified Anxiety Disorder. A.R. 563. With respect to Koepke's functional limitations, she wrote that he had marked limitations in his activities of daily living, maintaining social functioning and relationships, and maintaining concentration, persistence, or pace. A.R. 563. She noted that there was insufficient evidence that he had episodes of decomposition. A.R. 563.

### 8. State Agency Medical Consultants

On January 28, 2015, state agency medical consultant R. Ferrell, M.D., reviewed the records and concluded that Koepke is moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. A.R. 63-64. Dr. Ferrell opined that Koepke remains capable of performing simple tasks with limited public contact. A.R. 65.

On June 2, 2015, Kim Morris, Psy.D., reviewed the record on reconsideration and determined that Koepke has moderate impairments in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. A.R. 75-76. Dr. Morris wrote that Koepke has sufficient ability to understand and remember simple and detailed instructions; he can complete simple and some detailed instructions; he is able to follow directions without additional assistance once a task is learned; and he can maintain adequate attention, concentration, persistence, and pace as needed to complete a full work day or work week. A.R. 77. Dr. Morris opined that Koepke can maintain appropriate behavior in a context of limited peer interaction and public contact and respond appropriately to supervisors. A.R. 77. Dr. Morris stated that Koepke can make simple decisions, utilize transportation, and cope with the demands of a routine work-like environment. A.R. 77. Dr. Morris concluded that Koepke is limited to unskilled work with minimal public interaction. A.R. 77.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th

Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     ISSUES PRESENTED

Koepke argues that the ALJ erred in weighing the medical opinions and in not considering Koepke's school records. He argues that as a result of these errors, the ALJ erred in finding that Koepke's impairments do not meet or equal a listing and in determining Koepke's RFC. He also argues that the ALJ erred in assessing Koepke's credibility regarding the severity of his symptoms.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.    DISCUSSION

### A.     Weighing of the Medical Opinions

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating

physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 1. Leslie/Juan, Leslie/Johns Opinions

Koepke argues that the ALJ erred in giving only partial weight to the Leslie/Juan and Leslie/Johns opinions. Koepke received treatment from Berkeley Mental Health from May 2014 until November 2016, including therapy and case management services from Leslie and psychiatric services from Drs. Juan and Johns. Dr. Juan treated Koepke from May 2014 through September 2016, and following Dr. Juan's retirement, Dr. Johns supervised Leslie's treatment of Koepke from

September 2016 through November 2016. A.R. 314-80, 384-505, 524-65. Since Drs. Juan and Johns qualify as treating physicians, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount their opinions. *Lester*, 81 F.3d at 830. The opinion of treating physicians in disability cases is afforded greater weight because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

On May 20, 2015, Leslie, supervised by Dr. Juan, completed a mental impairment questionnaire. A.R. 411-15. They identified numerous impairments as detailed above, and opined that Koepke had marked impairment in activities of daily living and maintaining social functioning, extreme impairment in maintaining concentration, persistence, or pace, and one or two episodes of decompensation within a twelve-month period. A.R. 414. They wrote that Koepke's conditions were expected to last at least twelve months and that they expect his impairments would cause him to be absent from work more than four days per month. A.R. 411.

On November 17, 2016, Leslie, supervised by Dr. Johns, completed another mental impairment questionnaire. A.R. 524-28. They identified identical symptoms as in the previous assessment, and several impairments are recorded as more severe than in the previous year's assessment. A.R. 526-27. They concluded that Koepke has marked impairment in activities of daily living, extreme impairment in maintaining social functioning, extreme impairment in maintaining concentration, persistence, or pace, and one or two episodes of decompensation within a twelve month period. A.R. 527. They wrote that Koepke's conditions were expected to last at least twelve months and that they expect his impairments would cause him to be absent from work more than four days per month. A.R. 524.

The ALJ gave two reasons why he assigned only partial weight to these two opinions. First, he assigned less weight to the assessments where "they assessed greater restrictions on the claimant's ability to function than supported by the record." A.R. 23. He stated that the restrictive limitations Drs. Juan and Johns identified are "not entirely consistent with the record, including the claimant's admitted activities of daily living of household chores, taking care of his younger sister,

and engaging in reading, drawing, and playing video games." A.R. 23. The ALJ does not specifically identify which limitations he finds to be implausible, although the activities he identified seem to apply to limitations in the area of "activities of daily living." Both physicians identified "marked" impairment in this area. A.R. 414, 527. Treatment notes indicate that Koepke isolates himself in his home, does not interact with people other than his family, has "no social life" other than one or two online friends, and is too anxious to go to stores or use public transportation. A.R. 335, 389, 505. Therapy notes from April 14, 2015 record that Koepke "significantly curtailed daily activities due to anxiety" and that his symptoms of major anxiety persist even with medication. A.R. 429, 444. In October 2015, Dr. Juan recorded that Koepke was "slowly degrading into an agoraphobic life style." A.R. 426. Therapy notes from April 2016 describe Koepke as "almost housebound." A.R. 456. He continued to need assistance to complete tasks that would take him into public spaces, such as picking up his medication from the pharmacy or going to clinical visits with Dr. Juan. A.R. 453, 456, 465-66. In a comment section on the Leslie/Juan opinion, the treating sources explain that Koepke has "extreme anxiety and manages his experience by doing very little outside his home." A.R. 415. Similarly, the Leslie/Johns opinion states that Koepke "has extreme anxiety when he is in any situation outside of his home." A.R. 528. Activities outside the home, such as grocery shopping, picking up medication, and going to medical appointments, are all activities of daily living, and the ALJ does not discuss or consider the difference between Koepke's ability to function inside his own home and his ability to complete activities outside the home. The form assessment states that a "marked limitation my [*sic*] arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as **to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis**." A.R. 414, 527 (emphasis in original). Drs. Juan and Johns's opinion that Koepke has "marked" limitations in activities of daily living is not inconsistent with Koepke's greater ability to perform activities at home, since a "marked" limitation may be assessed where only some (or even one) activities are impaired to the degree specified. As the ALJ essentially ignores detailed and consistent findings in the record that Koepke suffers from significant and well-documented limitations outside his home, the court concludes that the ALJ's reason for discrediting

23

Drs. Juan and Johns's opinion that Koepke has "marked" limitation in activities of daily living is not a specific and legitimate reason supported by substantial evidence.

Second, the ALJ states that Dr. Juan (whom he incorrectly referred to as "Dr. Gordon") opined that Koepke has had at least one or two episodes of decompensation but "does not provide any medical evidence from the record to support this assessment." A.R. 23. There is no explanation supporting that Koepke suffered any episodes of decompensation during the treatment period, nor is there evidence of such episodes in the record. Accordingly, the ALJ offered a specific and legitimate reason to discredit Dr. Juan's opinion on this basis. However, this reason goes to a relatively minor portion of the opinion and does not discount Dr. Juan's other findings and opinions that are well-documented and supported by the record.

In sum, the court concludes that the ALJ erred with respect to assigning weight to the Leslie/Juan and Leslie/Johns opinions.

### 2. Wiebe Opinion

Koepke argues that the ALJ erred in giving only partial weight to the Wiebe opinion. As Dr. Wiebe is an examining physician, her opinion can only be rejected for specific and legitimate reasons that are supported by substantial evidence. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

On July 1, 2016, Wiebe completed a consultative psychological evaluation. A.R. 506-23. She provided a comprehensive review of Koepke's academic, employment, legal, and psychiatric history. A.R. 507-10. During her functional exam, Dr. Wiebe noted that Koepke has problems with attention, memory, anxiety, and somatic symptoms that affect his ability to manage activities of daily living. A.R. 510. She wrote that he has problems with insight, reasoning, and judgment that affect his ability to make sound decisions and manage his daily affairs. A.R. 510. She noted that he is unable to take public transportation due to anxiety and he would likely require assistance to be able to manage his own funds. A.R. 510.

Dr. Wiebe administered a battery of tests. A.R. 511. Koepke's overall intellectual functioning was estimated to be in the average to low average range. A.R. 511. With respect to attention and concentration, Dr. Wiebe reported that Koepke evinced "erratic, overall severe

24

impairment in functioning." A.R. 511. Koepke exhibited mild impairment in executive functioning and language, and severe impairment in memory. A.R. 512. His visual and spatial abilities were moderately impaired. A.R. 513. With respect to sensory and motor abilities, Koepke exhibited some psychomotor slowness and was easily fatigued, with overall mild impairment in that domain. A.R. 513. Dr. Wiebe opined that Koepke has moderate limitations in his ability to perform activities of daily life, and moderate to severe limitations in his social functioning. A.R. 521. She further concluded that he has marked limitations in his ability to understand, remember, and carry out very short and simple instruction. A.R. 522.

The ALJ provided two reasons for assigning Wiebe's opinion only partial weight. First, with respect to Dr. Wiebe's opinions on Koepke's ability to perform daily life activities and function socially, the ALJ stated: "Although the medical evidence of record shows some social isolation and anxiety symptoms, the claimant also reported to maintaining familial relationships and responsibilities at home, which is not entirely consistent with a severe impairment in these areas." A.R. 22-23. As detailed above, the ALJ's reliance on Koepke's ability to function in some capacities at home is an overly narrow interpretation of the ability to perform "daily life activities." The record as a whole consistently shows that Koepke is reclusive and does not engage in even basic activities outside the home without assistance, such as going to appointments, using public transportation, and going to the store, all of which are activities of daily life. A.R. 335, 389, 429, 444, 453, 456, 465-66, 505. Further, Dr. Wiebe's opinion accounts for Koepke's ability to be more functional at home as she assigned moderate limitation in his activities of daily life generally, and moderate to severe limitation in his social functioning. A.R. 521. Koepke's ability to interact with his family and do some chores at home is not a specific and legitimate reason supported by substantial evidence to discount Dr. Wiebe's opinion about his overall social functioning and ability to perform the spectrum of activities of daily life.

Second, the ALJ wrote that "the claimant's reported activities of daily life . . . support less restrictive limitations in his ability to understand, remember, and carry out simple and short instructions," a limitation for which Dr. Wiebe assigned a marked impairment. A.R. 23, 522. As examples, the ALJ pointed to Koepke's ability to read, take care of his younger sister, and enroll in

and attend school. A.R. 23. This is not a specific and legitimate reason to discount Dr. Wiebe's opinion, because it ignores substantial portions of the record. Koepke testified that he can only read a book for about 10 minutes before taking a break or getting distracted. A.R. 46. Further, while Koepke did enroll in a single college course, he needed extensive support in doing so. A.R. 334-42, 374-75, 377-79. Once he was enrolled, he reported that the first week of school was "terrifying," and he eventually dropped out because the class was too hard. A.R. 406, 431. To assess Koepke's memory, Dr. Wiebe administered the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS). A.R. 512. His performances on both the Immediate Memory Index and Delayed Memory Index were in the extremely low range of functioning, at the 0.1 percentile and <0.1 percentile, respectively. A.R. 512. Dr. Wiebe noted that while Koepke has "some impairment in [his] ability to encode, store, and retrieve information that is repeated multiple times," he can "be somewhat assisted to better retrieve that information when provided with memory cues." A.R. 512. The ALJ's incomplete and vague references to portions of the record do not undermine the validity of those findings or Dr. Wiebe's opinion regarding Koepke's ability to understand, remember, and perform simple tasks.

The court concludes that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to discount Dr. Wiebe's opinion.

### 3. Ordonez Opinion

Koepke argues that the ALJ erred in failing to consider the initial assessment performed by Ordonez when Koepke transitioned to care at Pathways to Wellness. As a nurse practitioner, Ordonez is not an "acceptable medical source" under the regulations, but rather is an "other source" who is not entitled to the same deference. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Leon v. Berryhill*, 880 F.3d 1041, 1046 (9th Cir. 2017). The opinions of "other sources" are reviewed under the same standard used to evaluate lay witness testimony. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010). To discount the opinion of a lay witness, the ALJ need only provide "germane reasons" for doing so. *Leon*, 880 F.3d at 1046.

On December 14, 2016, Ordonez completed an initial assessment for Koepke's transition to the Pathways to Wellness outpatient clinic. A.R. 558-65. The assessment records Koepke's self

reports of depression and anxiety. A.R. 560-61. Ordonez observed that Koepke appeared adequately groomed and was cooperative; that his mood was "okay"; and that he had a constricted and apathetic affect. A.R. 562. His thought process was linear and his abstract reasoning and fund of knowledge were fair. A.R. 562-63. She noted diagnoses of Major Depressive Disorder and Unspecified Anxiety Disorder. A.R. 563. With respect to Koepke's functional limitations, she wrote that he had marked limitations in his activities of daily living, maintaining social functioning and relationships, and maintaining concentration, persistence, or pace. A.R. 563. She noted that there was insufficient evidence that he had episodes of decomposition. A.R. 563.

As the Commissioner notes, there is nothing in the record that supports that Ordonez actually treated Koepke. It is unclear what records, if any, Ordonez reviewed prior to the single one-hour assessment she conducted. She took down Koepke's self-reported symptoms and medical history and completed a check-the-box assessment of Koepke's functional limitations, without further explanation or evidence as to those limitations. A.R. 561-65. *See* 20 C.F.R. § 404.1527(c)(1)-(2) (opinions from treating sources given greater weight where they provide a "detailed, longitudinal picture" of the medical impairments and present "relevant evidence to support a medical opinion").

Even if the ALJ erred in failing to address Ordonez's opinion, the error is harmless. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) ("[H]armless error applies in the Social Security context.") For opinions from "other sources," the adjudicator "generally should explain the weight given to opinions from [other] sources . . . when such opinions may have an effect on the outcome of a case." *Id.* § 404.1527(f)(2). Ordonez's check-the-box assessment does not add any additional information about Koepke's symptoms or limitations that are not already explored in depth by Koepke's other treating sources, who are acceptable medical sources. Under these conditions, Ordonez's assessment is at most duplicative of those opinions and would not affect the outcome of this case.

Accordingly, the court concludes that any error committed by the ALJ in failing to address Ordonez's opinion is harmless.

//

//

### B. School Records

Koepke argues that the ALJ erred in failing to consider his school records, which he states "documented a history of severe mental impairments and special education services from elementary through high school." Pltf. Mot. at 13. The records in dispute predate the alleged onset date of disability, which is June 1, 2014. A.R. 161. Koepke cites 20 C.F.R. section 416.912(b)(1) for the proposition that the ALJ had the responsibility to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] file[s] [the] application unless there is a reason to believe that development of an earlier period is necessary." Koepke asserts that the school records "provide valuable, longitudinal evidence of [Koepke's] mental health impairments and how they impacted his ability to function in the months preceding his application for disability benefits." Pltf. Reply at 9-10. The Commissioner responds that the ALJ did not have an obligation to summarize old records that predate the alleged onset date of disability. Def. Mot. at 7. The Commissioner asserts that the ALJ was aware of the impairments identified in the records and properly focused on their functional impact. *Id.*

In determining whether a claimant is disabled, an ALJ must "consider the medical opinions in [the] case record together with the rest of the relevant evidence [received]." 20 C.F.R. § 416.927(b). Categories of evidence are described in 20 C.F.R. section 416.913, and include objective medical evidence (such as medical signs or laboratory findings), medical opinions, other medical evidence (such as medical history or clinical findings), and evidence from nonmedical sources (defined as "any information or statement(s) from a nonmedical source . . . about any issue in your claim"). 20 C.F.R. § 416.913(a). The regulations do not prescribe a time period for which evidence is considered no longer relevant. On the contrary, the regulations tend to give more weight to evidence that provides a longitudinal picture of a claimant's condition. For example, medical opinions from treating sources are typically accorded more weight where the source is able to provide a "detailed, longitudinal picture of . . . medical impairments." 20 C.F.R. § 416.927(c)(2). Or, if there is reason to believe that a claimant's disability began earlier than the alleged onset date, then the ALJ has an affirmative responsibility to develop a complete medical history regardless of the alleged onset date. 20 C.F.R. § 416.912(b)(1)(ii).

Here, Koepke provided detailed records showing that he received special education services from third grade until he graduated high school in June 2014. A.R. 193-250. He underwent a number of psychological assessments over a period of approximately nine years that consistently reported attention problems, social withdrawal, anxiety, and depression. A.R. 223-26, 231, 245-50. The school records provide a longitudinal history of Koepke's mental impairments that is not fully captured by his relatively short treatment as an adult. Given the unique longitudinal perspective provided by Koepke's school records, the records are relevant to the issues in Koepke's claim and the ALJ was obligated to consider them as part of the entire case record submitted by Koepke. 20 C.F.R. § 416.927(b). Nor is it sufficient to assume that the ALJ considered the records and "properly focused on their functional impact," as the Commissioner argues. Def. Mot. at 7. Without any reference to the school records in the ALJ's opinion, it is impossible to determine whether the ALJ considered the records at all, much less assigned appropriate weight to them.

Accordingly, the court concludes that the ALJ erred in failing to consider Koepke's school records.

### C.    Koepke's Remaining Arguments

Koepke also argues that the ALJ erred in assessing Koepke's credibility with respect to the severity of his symptoms, erred in finding that Koepke's impairments do not meet or equal a listing, and erred in assessing Koepke's RFC. The court does not reach these arguments in light of its conclusion that the ALJ erred in weighing the medical opinions and failing to consider Koepke's school records. These errors may have impacted the ALJ's ultimate conclusion that Koepke's "subjective complaints are not fully consistent with the evidence and the objective medical evidence does not support the alleged severity of symptoms." A.R. 23. Under these circumstances, it makes sense on remand for the ALJ to reevaluate Koepke's credibility, the listing determination, and Koepke's RFC assessment.

//

//

//

//

## VII.  CONCLUSION

For the foregoing reasons, the court grants in part Koepke's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

**IT IS SO ORDERED.**

Dated: March 27, 2019



Donna M. Ryu
United States Magistrate Judge